# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Phoenixville Hospital, LLC,       :   CASES CONSOLIDATED

                    Appellant   :

                       :

          v.            :

                       :

County of Chester Board of      :

Assessment Appeals, Phoenixville  :

Area School District and      :   No. 1281 C.D. 2021

Borough of Phoenixville       :

                       :

                       :

Phoenixville Hospital, LLC,      :

                    Appellant   :

                       :

          v.            :

                       :

County of Chester Board of      :

Assessment Appeals and       :   No. 1285 C.D. 2021

Phoenixville Area School District  :   Argued: November 16, 2022

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
               HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE ANNE E. COVEY, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE ELLEN CEISLER, Judge
               HONORABLE LORI A. DUMAS, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON         FILED: February 10, 2023

         Phoenixville Hospital, LLC (Hospital), appeals from a decision of the

Court of Common Pleas of Chester County (trial court). After thorough review, we

agree with the County of Chester Board of Assessment Appeals (Board) that Hospital has waived all issues on appeal. Accordingly, we dismiss the appeal.

We dismiss as moot Hospital's application for relief seeking to strike the brief filed by Patientrightsadvocate.org and Families USA as *amici curiae* in support of the Board. We likewise dismiss as moot the conditional application of the Phoenixville Area School District (District) to strike the brief filed by the Hospital and Healthsystem Association of Pennsylvania as *amicus curiae* in support of Hospital.

## I. Background

In 2017, Reading Health System, now known as Tower Health, LLC (Tower Health), bought several for-profit hospital facilities and related properties formerly owned by Community Health Systems, a for-profit entity, in Montgomery and Chester Counties. Trial Ct. Op. at 11-12. Tower Health, a limited liability company (LLC) with federal nonprofit status under 26 U.S.C. § 501(c)(3), created a new LLC to run each of the purchased hospital facilities as a nonprofit entity. *Id.* at 11. Tower Health is the sole member of each new LLC. *Id.* at 11 & 13. Hospital is one of the new LLCs and operates a hospital facility in Chester County. *Id.* at 12-13.

The Board denied Hospital's application for a property tax exemption for tax years 2018 through 2021. Hospital appealed to the trial court, which held a *de novo* trial. The trial court also denied the property tax exemption, finding that Hospital failed to sustain its burden of proving entitlement to a tax exemption as a nonprofit entity.

2

Hospital then appealed to this Court. In response to the trial court's directive to file a concise statement of errors complained of on appeal pursuant to Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure (1925(b) Statement), Pa. R.A.P. 1925(b), Hospital filed a 19-page 1925(b) Statement containing some 87 issues and sub-issues. Application to Dismiss, Ex. A. In its subsequent opinion pursuant to Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure (1925(a) Opinion), Pa. R.A.P. 1925(a), the trial court stated that Hospital's 1925(b) Statement failed to comply with the rule's conciseness requirement and hindered the trial court in preparing its 1925(a) Opinion. 1925(a) Op. at 3.

Before this Court, Patientrightsadvocate.org and Families USA filed a joint brief as *amici curiae* in support of the Board's denial of the property tax exemption. Hospital has filed an application for relief seeking to strike the brief of the *amici* because it discusses matters not in the record. The District has filed a conditional cross-application seeking to dismiss the *amicus* brief of the Hospital and Healthsystem Association of Pennsylvania in the event that this Court strikes the brief of Patientrightsadvocate.org and Families USA.

## II. Issues

Hospital raises six issues in its brief on appeal, which we combine into three issues. First, Hospital asserts that it had standing to apply for a real estate tax exemption for tax year 2018 even though, at the time the application was filed in 2017, Hospital was not the legal owner of the property at issue. Second, Hospital contends that the trial court improperly considered expert testimony asserting legal conclusions and matters not included in the expert's report and erred by precluding

3

Hospital from presenting rebuttal expert testimony. Third, and primarily, Hospital maintains that it met all of the factual and legal requirements for a property tax exemption. In addition, Hospital argues that this Court should grant Hospital's application for relief and strike the brief filed by the *amici* because the brief improperly contained information not in the record before this Court and presented arguments not raised by the parties.

The Board opposes each of Hospital's arguments. Further, the Board has filed an application for relief seeking dismissal of this appeal. The Board posits that Hospital waived all of its issues on appeal because it filed a 1925(b) Statement that failed to comply with the rule's conciseness requirement.

We have reordered our discussion of the issues for convenience and clarity.

## III. Discussion[1]

## A. Standing for Tax Year 2018

The Board argues that for tax year 2018, Hospital had no standing to seek a tax exemption because Tower Health's purchase of the affected properties

---

[1] As this Court has stated:

> Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue . . . concerns a question of law, our scope of review is plenary.

4

was not complete or certain at the time it filed its applications for the tax exemptions in 2017. However, the asset purchase agreement was pending for several months before the deed transferring the properties was recorded in October 2017. *See* Trial Ct. Op. at 21 & 23-24; Reproduced Record (RR) at 999a-1000a; Hospital's Br. at 6. Moreover, the purchase transaction was complete before the Board's hearing on Hospital's application for a property tax exemption. *See* RR at 1643a-44a (reciting that transaction closed on October 1, 2017), 766a & 772a (Board decisions reciting that Board hearings were held on October 19, 2017 and September 12, 2018). Had the application for tax exempt status been delayed until the purchase transaction was complete and the deed recorded, the 2017 filing window for 2018 tax exempt status, which was May 1 to August 1, *see* RR at 752a & 756a, would have expired. Therefore, as the equitable owner of the property, Hospital maintains it was an aggrieved party entitled to apply for a tax exemption, in accordance with Section 8844(c)(1) & (2) of the Consolidated County Assessment Law (CCAL),[2] 53 Pa.C.S. § 8844(c)(1) & (2) (relating to annual appeal deadlines).

The trial court opined that Hospital lacked standing to apply for a 2018 tax exemption because neither Tower Health nor Hospital was the record owner of the property at issue at the time the application was filed. The trial court acknowledged that equitable ownership would be sufficient to confer standing. Trial

---

*Newman & Co. v. City of Phila.*, 249 A.3d 1240, 1244 n.5 (Pa. Cmwlth. 2021) (additional citations and quotation marks omitted). Specifically, in tax assessment appeals, the trial court is the finder of fact, and all matters of credibility and evidentiary weight are within its province; such findings are binding on appeal if they are supported by substantial evidence of record. *Lutheran Home v. Schuylkill Cnty. Bd. of Assessment Appeals*, 782 A.2d 1, 6 (Pa. Cmwlth. 2001) (first citing *Appeal of M.W. Kellogg Co.*, 492 A.2d 130 (Pa. Cmwlth. 1985); and then citing *St. Margaret Seneca Place v. Bd. of Prop. Assessment, Appeals & Rev.*, 640 A.2d 380 (Pa. 1994)).

[2] 53 Pa.C.S. §§ 8801-8868.

Ct. Op. at 21 & 23-24. However, the trial court deemed the purchase agreement insufficiently certain to confer equitable ownership status. *Id.* at 23-24. The trial court pointed to the conditional and complex nature of the purchase agreement and the number of conditions, including a $590 million bond issue, that had to be satisfied for the purchase of the multiple properties involved in Tower Health's purchase transaction, which included properties in both Montgomery and Chester Counties. *Id.* at 12 & 23-24. The trial court also observed that settlement for the transaction did not occur until October 2017, after several continuances. *Id.* at 24.

However, the trial court did not cite any authority to support its determination that the contingent nature of the purchase transaction deprived Hospital of standing in 2017 to pursue a tax exemption for the 2018 tax year. *See* Trial Ct. Op. at 21 & 23-24. We are likewise unaware of any such authority.[3]

Accordingly, we agree with Hospital that it had standing to seek a tax exemption prospectively for tax year 2018 while Tower Health's purchase transaction was pending.

### B. Waiver of Issues on Appeal

Rule 1925(a) of the Pennsylvania Rules of Appellate Procedure requires a trial court, upon receipt of a notice of appeal from its decision, to provide a written opinion explaining the reasons for its decision. Pa. R.A.P. 1925(a). Rule 1925(b)(4) provides, in pertinent part:

---

[3] Moreover, it is logical that the conditional nature of a purchase agreement should neither defeat equitable ownership nor impede the prospective purchaser's ability to seek a tax exemption for the ensuing year. Depending on the amount at issue and the purchaser's financial circumstances, the purchaser may need to know whether a tax exemption is available before finalizing the purchase transaction, as the purchase might not be financially feasible if the exemption will not be available.

6

(b) Direction to file statement of errors complained of on appeal; instructions to the appellant and the trial court.— If the judge entering the order giving rise to the notice of appeal ("judge") desires clarification of the errors complained of on appeal, the judge may enter an order directing the appellant to file of record in the trial court and serve on the judge a concise statement of the errors complained of on appeal ("[1925(b)] Statement").

. . . .

(4) Requirements; waiver.

(i) The [1925(b)] Statement shall set forth only those errors that the appellant intends to assert.

(ii) The [1925(b)] Statement shall concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge . . . .

. . . .

(iv) The [1925(b)] Statement should not be redundant or provide lengthy explanations as to any error. Where non-redundant, non-frivolous issues are set forth in an appropriately concise manner, the number of errors raised will not alone be grounds for finding waiver.

(v) Each error identified in the [1925(b)] Statement will be deemed to include every subsidiary issue that was raised in the trial court . . . .

Pa. R.A.P. 1925(b)(4).

Here, the trial court ordered Hospital to file a 1925(b) Statement. Hospital filed a 1925(b) Statement that was 19 pages long with 43 numbered issues and 45 sub-issues in paragraph 43, for a total of 87 issues and sub-issues. Application to Dismiss, Ex. A. In its Rule 1925(a) opinion, the trial court posited

7

that Hospital violated Rule 1925(b)'s conciseness requirement. 1925(a) Op. at 3. Notably, the trial court expressly declared that the 1925(b) Statement's lack of conciseness hampered its issuance of the 1925(a) Opinion. *Id.*

Consistent with the trial court's Rule 1925(a) Opinion, the Board filed an application for relief in the form of a motion to dismiss the appeal. The Board argues that Hospital's failure to comply with Rule 1925(b) waived all issues. We agree.

In *Eiser v. Brown & Williamson Tobacco Corp.*, a plurality of our Supreme Court opined that the number of issues in a 1925(b) statement should not, standing alone, result in waiver. 938 A.2d 417, 427 n.16 (Pa. 2007). The current Rule 1925(b)(4)(iv) reflects that principle. *See* Pa. R.A.P. 1925(b)(4)(iv).[4] In determining whether waiver is appropriate, a court should consider whether the circumstances indicate a lack of good faith by the appellant. *Eiser*, 938 A.2d at 427 n.16. However, lack of good faith may be inferred from the degree of noncompliance with Rule 1925(b), including lack of conciseness; a 1925(b) statement must not be "so lengthy that it does not meet the goal of narrowing down the issues previously raised to the few that are likely to be presented to the appellate court without giving the trial judge volumes to plow through." *Commonwealth v. Reeves*, 907 A.2d 1, 2-3 (Pa. Super. 2006);[5] *see also Jones v. Jones*, 878 A.2d 86, 89-90 (Pa. Super. 2005) (7-page statement listing 29 issues in narrative form showed

---

[4] "The [1925(b)] Statement should not be redundant or provide lengthy explanations as to any error. Where non-redundant, non-frivolous issues are set forth in an appropriately concise manner, the number of errors raised will not alone be grounds for finding waiver." Pa. R.A.P. 1925(b)(4)(iv).

[5] Although not binding, Superior Court decisions are persuasive authority in this Court. *See Lerch v. Unemployment Comp. Bd. of Rev.*, 180 A.3d 545, 550 (Pa. Cmwlth. 2018).

lack of good faith effort to comply with Rule 1925(b); "such 'voluminous' statements do not identify the issues that [a]ppellant actually intends to raise on appeal because the briefing limitations contained in [Pennsylvania Rule of Appellate Procedure] 2116(a)[ ] make[] the raising of so many issues impossible"); *Kanter v. Epstein*, 866 A.2d 394, 401 (Pa. Super. 2004) (raising an "outrageous" number of issues in a 1925(b) statement "deliberately circumvent[s] the meaning and purpose of Rule 1925(b) and . . . effectively preclude[s] appellate review . . ."); *Mundy v. Bureau of Admin. Adjudication* (Pa. Cmwlth., No. 1984 C.D. 2012, filed Apr. 5, 2013)[6] (first citing *Eiser*; then citing *Jones*; and then citing *Reeves*).

Here, our review of Hospital's 1925(b) Statement reveals a significant number of issues that are redundant and/or not concise. Issues and sub-issues are set forth and discussed in a level of detail more appropriate to a brief than a statement of issues, in violation of Rule 1925(b)(4)(iv). As a result, many issues that should constitute single short paragraphs are needlessly expanded, broken out into parts, and distributed into numerous paragraphs or subparagraphs. Hospital has also thereby ignored Rule 1925(b)(4)(v)'s admonition that error statements are deemed to include all subsidiary issues properly raised in the trial court. Although the number of issues alone generally does not trigger waiver, that principle applies only where the stated issues are concise and not redundant. *See* Pa. R.A.P. 1925(b)(4)(iv). That is not the case here. Rather, Hospital forced the trial court to "plow through" a mass of issues that the trial court expressly stated created an impediment to its

---

[6] We cite this unreported opinion as persuasive authority pursuant to Section 414(a) of this Court's Internal Operating Procedures. 210 Pa. Code § 69.414(a).

consideration of the issues and preparation of the 1925(a) Opinion.[7] 1925(a) Op. at 3; *see Reeves*, 907 A.2d at 2-3.

Significantly, in its docketing statement, Hospital was able to keep its statement of issues to two pages with eight issues. Its appellate brief ultimately raised only six issues, which this Court consolidated to three issues for discussion. Thus, there was neither need nor justification for a 1925(b) Statement that listed nearly 11 times more issues than the docketing statement, over 14 times more issues than the statement of questions in Hospital's brief, and nearly 30 times the number of actual issues discerned by this Court.

This case is analogous to others where waiver has been found. *See, e.g.*, *King v. Riverwatch Condo. Owners Ass'n* (Pa. Cmwlth., No. 881 C.D. 2014, filed Apr. 24, 2015), slip op. at n.6 (finding waiver where 1925(b) statement of errors was 18 pages long and contained 51 paragraphs); *Tucker v. R.M. Tours*, 939 A.2d 343 (Pa. Super. 2007), *aff'd*, 977 A.2d 1170 (Pa. 2009) (finding waiver where 1925(b) statement of errors was 16 pages long and contained 76 paragraphs plus exhibits). Indeed, this Court is unaware of any similarly egregious instance where waiver was not found.

For these reasons, we conclude that Hospital has waived all of its issues on appeal for failure to comply with Rule 1925(b). Nevertheless, we address Hospital's appellate issues for completeness, and note that, even if Hospital had not waived all issues on appeal, we would affirm the trial court's decision on the merits.

---

[7] At oral argument, Hospital's counsel indicated that the 1925(b) Statement was initially made lengthy to ensure that nothing was missed, and was then pared down later for briefing. This kitchen-sink approach to the 1925(b) Statement is contrary to the very purpose of Rule 1925(b), which is intended to *narrow* the issues the trial court must review and address in its 1925(a) Opinion. *See Commonwealth v. Reeves*, 907 A.2d 1, 2-3 (Pa. Super. 2006).

<strong>C. Entitlement to Real Estate Tax Exemption</strong>

<strong>1. General Legal Requirements for Tax Exemption</strong>

Pursuant to article VIII, section 2(a)(v) of the Pennsylvania Constitution, the General Assembly may by law exempt from taxation "[i]nstitutions of purely public charity . . . ." PA. CONST. art. VIII, § 2(a)(v). In order to implement article VIII, section 2(a)(v), the General Assembly enacted the Institutions of Purely Public Charity Act,[8] commonly known as Act 55. In order to qualify for an exemption as an institution of purely public charity, an entity must meet both the constitutional requirements set forth in *Hospital Utilization Project v. Commonwealth*, 487 A.2d 1306 (Pa. 1985), known as the *HUP* test, and the statutory requirements of Act 55. *See Mesivtah Eitz Chaim of Bobov, Inc. v. Pike Cnty. Bd. of Assessment Appeals*, 44 A.3d 3, 9 (Pa. 2012). The entity must also comply with any additional and not inconsistent requirements of the CCAL. *See* 53 Pa.C.S. § 8812(a)(3) & (c).

The party seeking a tax exemption has the burden of proving its entitlement to the exemption. *See* Section 236 of the Tax Reform Code of 1971,[9] 72 P.S. § 7236; *Fayette Res., Inc. v. Fayette Cnty. Bd. of Assessment Appeals*, 107 A.3d 839, 844-45 (Pa. Cmwlth. 2014).

<strong>2. The <em>HUP</em> Test</strong>

<strong>a. Legal Requirements</strong>

In order to qualify for an exemption under any law enacted pursuant to article VIII, section 2, an entity must show that it is an institution of "purely public

---

[8] Act of November 26, 1997, P.L. 508, No. 55, 10 P.S. §§371-385.

[9] Act of March 4, 1971, P.L. 6, *as amended*, 72 P.S. §§ 7101-10004.

charity" by satisfying the five criteria of the *HUP* test; specifically, the entity must show that it:

> (a) Advances a charitable purpose;
>
> (b) Donates or renders gratuitously a substantial portion of its services;
>
> (c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;
>
> (d) Relieves the government of some of its burden; and
>
> (e) Operates entirely free from private profit motive.

*HUP*, 487 A.2d at 1317.

An institution advances a charitable purpose "if it benefits the public from an educational, religious, moral, physical or social standpoint." *City of Washington v. Bd. of Assessment Appeals*, 704 A.2d 120, 122-23 (Pa. 1997) (citing *HUP*, 487 A.2d at 1315). An institution can advance a charitable purpose even where it accepts payment from those who are able to pay or from Medicare or Medicaid. *See St. Margaret Seneca Place v. Bd. of Prop. Assessment, Appeals & Rev.*, 640 A.2d 380, 383 (Pa. 1994) (finding that accepting Medicaid payments was "perfectly consistent" with a nursing home's charitable purpose). Further, an institution relieves the government of some of its burden where "the institution bears a substantial burden that would otherwise fall to the government"; the institution need not "fully fund[] the care of some people who would otherwise be fully funded by the government." *Id.* at 384.

The final criterion of the *HUP* test, operating "entirely free from private profit motive," is a major issue in this appeal. In applying this criterion, "surplus revenue is not synonymous with private profit . . . ." *Guthrie Clinic, Ltd. v. Sullivan Cnty. Bd. of Assessment Appeals*, 898 A.2d 1194, 1199 n.6 (Pa. Cmwlth. 2006) (first

12

citing *Wilson Area Sch. Dist. v. Easton Hosp.*, 747 A.2d 877, 880 (Pa. 2000); and then citing *St. Joseph Hosp. v. Berks Cnty. Bd. of Assessment Appeals*, 709 A.2d 928, 938 (Pa. Cmwlth. 1998)). Instead, the analysis focuses on how such revenue is used, specifically:

> 1) Whether the utilization of the revenue is made with the expectation of a reasonable return or some non-monetary benefit;
>
> 2) Whether the utilization of the revenue ultimately supports or furthers the eleemosynary nature of the charitable entity; and
>
> 3) Whether the utilization of the revenue inures, directly or indirectly, to any private individual related to the charitable entity or related organization(s).

*Wilson*, 747 A.2d at 880. Under the third of these factors, in determining whether revenue is used in furtherance of an institution's charitable purpose, courts consider the compensation of the institution's executives to determine whether it includes a "private or pecuniary return." *HUP*, 487 A.2d at 1312 (quoting *Episcopal Acad. v. Philadelphia*, 25 A. 55, 56 (Pa. 1892)). That analysis requires consideration of whether the amount of executive compensation is reasonable, and the extent, if any, to which it is based on the financial performance of the institution. *Compare, e.g.*, *Wilson*, 747 A.2d at 881 (upholding a tax exemption where hospital executives received reasonable salaries and no bonuses or fringe benefits), *with In re Dunwoody Vill.*, 52 A.3d 408, 423 (Pa. Cmwlth. 2012) (denying exemption where, *inter alia*, "a substantial percentage" of executive compensation was based on the institution's financial or marketplace performance).

## b. Analysis

Although the evidence described above can be construed as relating to all of the *HUP* test's criteria, the trial court posited that Hospital "chose to address only whether it met the charitable purpose test" based on "the very fact that it is an acute care hospital with an open admission policy . . . ." Trial Ct. Op. at 28. The trial court concluded that the "evidence fails to speak to whether [Hospital] meets all the criteria set forth in the variety of tests that govern exemption from real estate taxation." *Id.* at 29. Nonetheless, the trial court went on to acknowledge and discuss Hospital's arguments under some other factors of the *HUP* test.

## i. Profit Motive

As this Court has explained, "the diversion of surplus monies into other entities that have a profit motive is evidence of a profit motive." *Phoebe Servs., Inc. v. City of Allentown*, 262 A.3d 660, 670 (Pa. Cmwlth. 2021), *appeal denied*, 273 A.3d 509 (Pa. 2022). Here, the trial court found the record did not support the reasonableness of the management fees and bond interest charges. Thus, the trial court inferred a profit motive in the payment and collection of unsupported fees and charges.

The trial court found that Tower Health generates income solely through charges it imposes on various LLCs, including Hospital, in the form of management fees, central business office fees, and bond issue interest payment obligations. Trial Ct. Op. at 13. In the trial court's view, Tower Health drew money from the hospitals without sufficient explanation and "at an alarming rate." *Id.* (citing RR at 1087a-89a). The trial court observed that Tower Health charged Hospital $3,500,000 in management fees for 2018, an amount that increased to

14

$21,700,000 by 2020. *Id.* The trial court found no evidence was presented to support the reasonableness of these "ever-increasing" management fees. *Id.* at 14.

The trial court found that Tower Health improperly charged exorbitant fees to all of the hospital LLCs and applied hospital funds for purposes other than support of the specific hospital. Trial Ct. Op. at 38. Hospital did not scrutinize whether the fees were reasonable for the services provided by Tower Health. *See, e.g.*, RR at 127a & 152a (testimony by Hospital's chief executive officer (CEO) that he did not know what percent of $58 million in capital expenditures by Tower Health was allocated to Hospital); Trial Ct. Op. at 36 (observing that "[n]o one questioned" the Tower Health executive salaries or why the management fees were so high). Further, the trial court found that "Tower Health presented no justification for taking such large sums as a management fee . . . ." Trial Ct. Op. at 27.

The trial court also found the use of interest payments on the bonds for acquisition of properties other than the hospitals at issue was improper and that "[n]ot one penny from the bonds were [sic] applied to support and to increase the efficiency and facilities of each hospital." Trial Ct. Op. at 38-39. The trial court explained that the purchase transaction to acquire the various hospitals involved in Tower Health's asset purchase was funded by a $590 million bond issue that served as both purchase funds and operating capital. *Id.* at 12. Although the individual LLCs did not receive any of the bond issue proceeds directly, they are all part of an "obligated group," members of which pledged their assets as collateral for the bond issue and pay proportional shares of the interest on the bonds. *Id.*

Moreover, as discussed below, the trial court observed that the federal excise tax charged to Tower Health because of its excessive executive compensation was then assessed by Tower Health against the hospital LLCs; the trial court

15

concluded "the payments from each hospital to Tower [Health] clearly was [sic] not then applied to the hospitals' benefit, but rather to their detriment." Trial Ct. Op. at 39.[10]

We find no error in the trial court's reasoning. Therefore, we agree with the trial court that Hospital failed to sustain its burden of demonstrating the absence of a profit motive behind its management fees and bond interest payments.

Diversion of money to employees through excessive salaries and fringe benefits may also evidence a private profit motive. *Phoebe Servs.*, 262 A.3d at 670 (first citing *St. Margaret*, 640 A.2d at 385; and then citing *Dunwoody Vill.*, 52 A.3d at 422-23). Notably, tying executive compensation to the entity's financial performance is indicative of a profit motive. *See Phoebe Servs.*, 262 A.3d at 670 (citing *Dunwoody Vill.*, 52 A.3d at 423).

Here, the trial court pointed to substantial salary increases paid to Tower Health executives, purportedly connected to their work in support of the 2017 multi-property purchase transaction. Trial Ct. Op. at 14. However, the trial court found Tower Health's executives did nothing other than foster the purchase transaction, and there was no evidence that the executives' services helped any individual hospital provide its services. *Id.* Further, the trial court observed that Tower Health was subject to a federal excise tax as a nonprofit entity paying its executives more than $1,000,000 per year. *Id.* at 16. The trial court intimated that imposition of the excise tax, which Tower Health passed on to Hospital and the other

---

[10] The trial court did not cite to the record for its findings, and Hospital challenges many of them as not supported by the record. However, the trial court's decision is supported more by the evidence it found absent than the purported evidence it referenced.

16

new LLCs, was an indicator of unreasonably high executive salaries. *See id.* at 27-28.

The trial court also found that Tower Health's executive compensation bonus incentives were weighted 70% on financial performance and 30% on patient care and patient satisfaction. Trial Ct. Op. at 15. Although Hospital asserts this figure is without evidentiary support,[11] Hospital witnesses acknowledged that 40% of the bonus incentives, their largest single component, was based on achieving financial performance goals. RR at 371a, 373a, 739a & 746a. The trial court made no finding of the percentage relationship between potential bonuses and base salaries. However, even accepting, *arguendo*, Hospital's assertion that the financial performance component was 40% rather than 70% of the bonus incentive, we nonetheless conclude that tying 40% of incentive bonuses to financial performance is substantial, as discussed below.

Further, according to the trial court, "[H]ospital's expert witness on compensation . . . testified that this incentive compensation plan was specifically designed to impact the behavior of the employees and management team. The plan was to focus their attention on the incentive compensation to drive their behavior to make more money." Trial Ct. Op. at 35-36. The trial court found "[i]t was very clear from the testimony of all the witnesses that the health system was set up to be profitable and to reward executives at all levels when it was. Its goal went far beyond self-support." *Id.* at 36.

Hospital justified its compensation incentives by asserting that otherwise it could not attract and retain qualified executives. Trial Ct. Op. at 36; RR

---

[11] During cross-examination, there was an assertion, which the witness disputed, that 70% of the bonus incentive was tied to financial performance. *See* RR at 373a-75a.

at 743a (opining that "it was necessary for the organization to be competitive to retain the executive team because of the heavy lift . . . that was going to be needed to integrate [the purchased] hospitals into Tower Health"), 744a (stressing the need to retain "key members of the team through what was going to be a very difficult and challenging integration") & 747a (asserting that performance incentives are "necessary to attract and retain a high quality, high performance executive team"). The trial court found insufficient support for Hospital's assertion. Trial Ct. Op. at 36. Instead, the trial court rejected Hospital's reasonableness argument regarding Tower Health's executive salaries in scathing terms:

> The evidence demonstrated that [the CEO] and the Board of Tower Health were no more tha[n] corporate health care raiders. No one questioned the executives of Tower Health for what they were being paid $2,500,000 per year or why they drained $22,000,000 per year from, for example, [Hospital]. Within three weeks of trial, Tower [Health] dismissed as employees the President of [the] Jennersville [facility] and Brandywine Hospital along with other executives and announced that [the] Jennersville [facility] would close. Other [h]ospitals have been sold, are for sale, or will just be given away as seems will be the case with Brandywine Hospital. The goal as evident from the financial documentation offered at trial was simple and direct – drain the juice out of the hospitals until there was nothing left but a dried-out husk and then leave, close the doors, or sell what was left. [The] Jennersville [facility] is now closed, Brandywine for sale and while this harvesting strategy may not have killed [Hospital], it is left with little more than a skeleton.

Trial Ct. Op. at 36-37.

In *Dunwoody Village*, this Court explained that the requirements of the *HUP* test are separate from those of Act 55. 52 A.3d at 422 (explaining that "an entity seeking a tax exemption as an institution of purely public charity must first

18

meet the constitutional requirements of the *HUP* test before the question of whether it satisfies the corresponding statutory criteria in Act 55 can be addressed") (citing *Mesivtah Eitz Chaim*). For example, Act 55 requires an applicant for a tax exemption to demonstrate, in part, that employee compensation "is not based primarily upon the financial performance of the institution." *Dunwoody Vill.*, 52 A.3d at 421 (quoting Section 5(c)(3) of Act 55, 10 P.S. § 375(c)(3)) (additional quotation marks omitted). However, the *HUP* test, which must be satisfied first, may preclude a tax exemption even though less than the majority of an employee's compensation is based on the institution's financial performance. *Dunwoody Vill.*, 52 A.3d at 422.

In *Dunwoody Village*, executive compensation "included incentives related to [the institution's] financial or marketplace performance," such that compensation was based "in part" on the institution's annual financial performance. 52 A.3d at 422-23. This Court observed that the CEO's maximum incentive bonus was 24% of salary and the chief financial officer's was 18-19%. *Id.* at 423. Thus, we observed that "a substantial percentage" of compensation was based on financial performance. *Id.* Notably, there was no discussion in *Dunwoody* stating how much of the bonus incentive was tied to financial performance rather than other criteria. *See id.* Nonetheless, we affirmed a lower court's decision that the institutional taxpayer "failed to establish that it operate[d] entirely free from private profit motive." *Id.* (additional citation omitted).

*Phoebe Services* concerned an application for an exemption from a business privilege tax imposed by a city ordinance. At issue was whether the nonprofit taxpayer was a "business" within the meaning of the ordinance, which defined that term as "any activity carried on or exercised for gain or profit in the

19

[c]ity." 262 A.3d at 663. The city argued that the taxpayer operated with a profit motive because its executive compensation included bonuses based on financial performance. *Id.* at 666. This Court found cases analyzing the *HUP* test's "private profit motive" criterion, including *Dunwoody Village*, to be instructive. *Id.* at 669. Contrary to the city's argument, however, we found the executive compensation in *Phoebe Services* was "not directly tied to the financial status of the nonprofit." *Id.* at 671. Thus, *Phoebe Services* is distinguishable from *Dunwoody Village* in this regard.

There is no bright-line test of what constitutes a substantial percentage of compensation based on financial performance. In the circumstances of this case, however, we cannot say that basing 40% of the total incentive bonus on financial performance was not substantial. Therefore, we conclude that the trial court did not err in finding Hospital failed to prove it operated free from a profit motive.

### ii. Gratuitous Services

The trial court also rejected Hospital's position that it renders a substantial portion of its services gratuitously. The trial court pointed to Hospital's own application for a sales tax exemption, in which Hospital stated it provided services to 199,405 people, of whom 152, only .076%, received free services, and 10,483, or 5%, received fee reductions.[12] Trial Ct. Op. at 17; RR at 937a. Hospital acknowledged that only about 5% of its patients received fee reductions of at least 10% of the cost of goods or services provided to them. RR at 937a. The trial court found that the percentage of uncompensated care provided by Hospital was "clearly

---

[12] The trial court's calculation of .00076% and .050% mistakenly reflects the raw quotients as percentage figures.

not substantial." Trial Ct. Op. at 29. The trial court further found that Hospital's evidence of the amounts and percentages of uncompensated care compared to its total operating expenses "carrie[d] little weight" under the *HUP* test. *Id.* The trial court's findings of fact were supported by competent evidence. *See* RR at 937a. Accordingly, we will not disturb them on appeal.

Hospital also offered testimony that it satisfied the gratuitous services requirement for a property tax exemption because of shortfalls in reimbursement received for care provided to insured patients through Medicare and Medicaid.[13] Trial Ct. Op. at 18; *see* RR at 356a-60a. However, although a Hospital witness testified that Hospital had a master charge list reflecting the gross charge for each medical service, no such sheet was produced in evidence and no witness testified to those charges. Trial Ct. Op. at 18; *see* RR at 134a. As the trial court characterized the evidence, Hospital negotiates payments with "a wide variety of third-party payors" and then incorrectly "argues that because these negotiations result in the acceptance of payments that are less than what is initially requested on the master charge sheet, which are inflated to begin with,[14] [Hospital] must be considered to have offered uncompensated care." Trial Ct. Op. at 19.

Hospital correctly asserts that reimbursement shortfalls from Medicare and Medicaid may constitute donations of gratuitous services. *See Wilson Area Sch. Dist.*, 747 A.2d at 878 (stating that "the total value of [the h]ospital's services that

---

[13] The testimony given actually related specifically to Act 55 criteria, not the *HUP* test. *See* RR at 317a & 350a. However, a gratuitous service requirement exists in both Act 55 and the *HUP* test.

[14] For example, Hospital's CEO testified that the master charge list of gross charges was irrelevant and insignificant regarding the amounts Hospital actually receives for services, but that he nonetheless sent a letter to community leaders in December 2018 stating that he was excited to share news about a reduction of 30% in master charge list amounts. RR at 134a-35a.

were rendered gratuitously to individuals . . . includ[es] traditional uncompensated charity care, Medicaid and Medicare shortfalls, and bad debt expenses"); *St. Margaret Seneca Place*, 640 A.2d at 382-83 (positing that "[o]ur prior decisions do not equate the acceptance of Medicaid payments as the equivalent of conducting a business for profit. The decision to accept Medicaid payments to help defray the cost of care for residents is perfectly consistent with a finding that the nursing home advances a charitable purpose."); *Lewistown Hosp. v. Mifflin Cnty. Bd. of Assessment Appeals*, 706 A.2d 1269, 1272 (Pa. Cmwlth. 1998) (stating that shortfalls in cost reimbursement by Medicare and Medicaid reflect gratuitous donation of services). However, the trial court rejected Hospital's argument that reimbursement shortfalls for Medicare and Medicaid patients constituted gratuitous services in this case. We discern no error in the trial court's determination.

First, the trial court observed that Hospital did not consider whether patients with Medicare or Medicaid coverage also had supplemental insurance to cover shortfalls in Medicare or Medicaid reimbursements. Trial Ct. Op. at 20 & 30. In addition, the trial court rejected the reliance on "Trend Reports"[15] by Hospital's accounting expert, Robert Cepielik (Cepielik), to support his payment shortfall calculations; the trial court found the Trend Reports were "unreliable" and based on "numbers not properly audited." *Id.* at 30. The trial court likewise rejected Cepielik's testimony that his opinion was based on "[generally accepted accounting principles (GAAP)]-like" numbers,[16] positing that "[t]here is no such thing. This is

---

[15] Robert Cepielik (Cepielik) used the trend report to identify gross charges for Medicaid recipients. RR at 343a.

[16] When asked whether he followed GAAP in calculating the amount of Hospital's uncompensated care, Cepielik hedged in acknowledging that the financial information on which he relied was not GAAP information. *See, e.g.*, RR at 342a (stating that a Medicare provider's

22

a binary selection. Figures relied upon either were or were not prepared in accordance with GAAP. These were not."[17] *Id.*

Moreover, in considering whether Hospital's gratuitous services relieved the government of some of its burden, the trial court observed that Medicare reimburses about 9% of the master charge sheet amounts, while Blue Cross pays only 5.73% of such amounts. Trial Ct. Op. at 32. The trial court found that "[a] clear financial reason to take more government insurance patients is the higher reimbursement rate." *Id.* The trial court reasoned further:

> The testimony and data clearly lead to a conclusion that the government is assuming more of [the] obligation or burden to provide health care. One could conclude that in

report was "not a GA[A]P number [but] an input into calculating a GA[A]P number"), 353a (explaining that "[b]ooks and records of the organization are maintained to support GA[A]P . . . financial statements. The information that I'm deriving here are GA[A]P type numbers or fit into their GA[A]P number.") & 379a (explaining that provider and statistical (PS&R) reports are not GAAP revenue numbers; "[t]hey are close but they don't exactly align [sic] up"). The following colloquy during cross-examination is emblematic of Cepielik's equivocal testimony about his reliance on non-GAAP figures:

> Q [The] PS&R report is not prepared in accordance with generally accepted accounting principles?

> A I would say it provides important information when you're looking at GA[A]P numbers.

> Q It's not prepared in accordance with GA[A]P.

> A It is prepared in accordance with GA[A]P. It's reflective of information that shows payment information like a checkbook shows payment information to the extent that it represents what it represents. It's input to a GA[A]P number.

*Id.* at 379a.

[17] We note that the specific recognition of GAAP calculations, like that of calculating gratuitous services as a percentage of operating expenses, is found in Act 55 rather than expressly required under the *HUP* test. *See* 10 P.S. § 375(f)(3). The trial court acknowledged as much in its discussion of GAAP in relation to the *HUP* test. Trial Ct. Op. at 30 n.2.

23

1985, the Supreme Court recognized in *HUP* that if the government was only paying for 11% of the population's health care, a given hospital [was] relieving the government of 89% of its burden. In 2019, the government was now paying nearly one-half of the population's health care costs. Rather than relieving the government of a burden, [Hospital's] financial model in place is to increase [the] burden on the government and reliance on government insurance payments.

*Id.* at 31-32 & nn.3-4 (first citing Health Care Fin. Rev., 1992[18]; and then citing U.S. Census Bureau Current Population Survey, 2020 Annual & Economic Supplement). In addition, the trial court found that the evidence showed the costs listed on the master charge sheet were "meaningless" and that "the reimbursement percentage stated above is likely higher or is closer to actual costs of services." Trial Ct. Op. at 32; *see also* RR at 134a-35a (testimony by Hospital's CEO that the master charge list of gross charges was irrelevant and insignificant regarding the amounts Hospital actually receives for services). The trial court reasoned:

There was no testimony as to the cost of a procedure or what any of the now multiple insurance plans pay for that procedure. That information was solely within the control of [] Hospital. It could have produced the agreements and financial arrangements, under a confidentiality agreement if necessary, thus allowing a proper analysis[,] but it did not. The conclusion left to be reached is that such information would not support [Hospital's] exemption argument. Although uncompensated Medicare costs may be considered in an exemption analysis, the evidence

_____

[18] The Health Care Financing Review was a journal "released from 1979 and 2009 with the goal of presenting information and analyses on a broad range of health care financing and delivery issues to improve the understanding of the Medicare and Medicaid Programs and the U.S. health care system"; it is currently archived on the website of the Centers for Medicare & Medicaid Services. *See* https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Archives/HCFR (last visited Feb. 9, 2023).

offered at trial leaves the court merely to speculate as to the amounts of uncompensated care.

Trial Ct. Op. at 32-33.

The trial court similarly found Hospital failed to establish that its bad debt write-offs constituted gratuitous donations of care for tax exemption purposes. Although Hospital offered expert testimony concerning the amount of bad debt write-offs, there was no evidence concerning the reason for nonpayment or whether any patients whose debts were written off actually had the means to pay. *See* RR at 334a & 340a. The trial court explained that write-offs for patients who have the financial means to pay "is not charity when [H]ospital decided not to pursue the collection of these accounts"; thus, Hospital's ever increasing []bad debt[] write-offs do not equal an increase in donated care, to those []who otherwise could not afford to pay." Trial Ct. Op. at 33 (additional quotation marks omitted).

We agree with the trial court that Hospital failed to show the amount of gratuitous services it provided because it did not provide information concerning whether patients receiving free, discounted, or unreimbursed services actually had the ability to pay the full costs. Although inability to pay is not expressly part of the *HUP* test, it was recognized as relevant to gratuitous services in *St. Margaret Seneca Place*. *See* 640 A.2d at 384; *accord Dunwoody Vill.*, 52 A.3d at 421 (affirming a finding that the operator of a nonprofit retirement community failed to demonstrate that it relieved the government of part of its burden, where most of its residents could afford to pay the applicable fees and costs). We conclude that the trial court did not err in determining that gratuitous services to persons who can afford to pay do not satisfy any factor of the *HUP* test.

25

### 3. Act 55 Factors

### a. Legal Requirements

The requirements of Act 55 are similar but not identical to those of the *HUP* test. The statement of legislative purpose of Act 55, set forth in Section 2(b), provides in full:

> It is the intent of the General Assembly to eliminate inconsistent application of eligibility standards for charitable tax exemptions, reduce confusion and confrontation among traditionally tax-exempt institutions and political subdivisions and ensure that charitable and public funds are not unnecessarily diverted from the public good to litigate eligibility for tax-exempt status by providing standards to be applied uniformly in all proceedings throughout this Commonwealth for determining eligibility for exemption from State and local taxation which are consistent with traditional legislative and judicial applications of the constitutional term "institutions of purely public charity."

10 P.S. § 372(b); *see also WRC N. Fork Heights, Inc. v. Bd. of Assessment Appeals*, 917 A.2d 893, 907 n.15 (Pa. Cmwlth. 2007). Consequently, Act 55's requirements are specified in much greater detail than the *HUP* test provides.

Section 5(a) of Act 55, 10 P.S. § 375(a), requires an entity seeking a tax exemption as an institution of purely public charity to satisfy Sections 5(b) through 5(f). Although Section 5 is lengthy, the following provisions are most pertinent here:

> (c) PRIVATE PROFIT MOTIVE.—The institution must operate entirely free from private profit motive. Notwithstanding whether the institution's revenues exceed its expenses, this criterion is satisfied if the institution meets all of the following:
>
> > (1) Neither the institution's net earnings nor donations which it receives inures to the benefit of private shareholders or other individuals . . . .

. . . .

> > (3) Compensation, including benefits, of any director, officer or employee is not based primarily upon the financial performance of the institution.
>
> . . . .
>
> (f) GOVERNMENT SERVICE.—The institution must relieve the government of some of its burden. This criterion is satisfied if the institution meets any one of the following:
>
> > (1) Provides a service to the public that the government would otherwise be obliged to fund or to provide directly or indirectly or to assure that a similar institution exists to provide the service.
> >
> > . . . .
> >
> > (3) Receives on a regular basis payments for services rendered under a government program if the payments are less than the full costs incurred by the institution, as determined by generally accepted accounting principles.
> >
> > . . . .

10 P.S. § 375(c)(1) & (3) & (f)(1) & (3).

### b. Analysis

For this test, the trial court opined that Hospital focused solely on the "community service" factor. Trial Ct. Op. at 39-40. Reiterating the Act 55 requirement that calculations be based on GAAP, 10 P.S. § 375(f)(3), the trial court rejected Cepielik's calculations as noncompliant, as it had under the *HUP* test, because they were based on "GAAP-like" or "non-GAAP numbers."[19] *Id.* at 40.

---

[19] The trial court did not separately discuss other Act 55 factors, instead referring generally to its *HUP* discussion. Trial Ct. Op. at 39-40.

27

The trial court suggested Cepielik could and should simply have obtained audited financial statements, which are prepared in accordance with GAAP. *Id.* Therefore, the trial court inferred from the failure to produce or use such reports that they would have been unfavorable to Hospital's position. *Id.*

The trial court found Hospital failed to demonstrate that it applied GAAP in calculating its financial evidence. Trial Ct. Op. at 30. We discern no error in the trial court's finding. Therefore, we agree with the trial court that Hospital failed to demonstrate compliance with Act 55's requirements.

### 4. CCAL Factors

### a. Legal Requirements

The CCAL "is to be read *in para materia* with" Act 55; Act 55 supersedes any inconsistent provision of the CCAL. 53 Pa.C.S. § 8812(c).

Under Section 8812(a)(3)(i) and (iii) of the CCAL, any hospital that is "founded, endowed, and maintained by public or private charity" is exempt from county and local taxes so long as the following apply:

> (i) The entire revenue derived by the entity is applied to support the entity and to increase the efficiency and facilities of the entity, the repair and the necessary increase of grounds and buildings of the entity and for no other purpose.

> (ii) The property of purely public charities is necessary to and actually used for the principal purposes of the institution and not used in such a manner as to compete with commercial enterprise.

53 Pa.C.S. § 8812(a)(3)(i) & (ii). The CCAL applies to all second class A through eighth class counties. Chester County is a third class county.

**b. Analysis**

The trial court limited its discussion of the CCAL to Section 8812(b)(1), which renders real property subject to taxation if "any income or revenue is derived, other than from the recipients of the bounty of the institution or charity." 53 Pa.C.S. § 8812(b)(1); Trial Ct. Op. at 41. The trial court did not separately discuss other CCAL factors, referring again instead generally to its *HUP* and Act 55 discussions. Trial Ct. Op. at 41.

The trial court found that Hospital derived income from other than the recipients of its bounty because non-employee physicians with privileges at Hospital are part of for-profit medical practices and bill patients directly for their services. Trial Ct. Op. at 41. Moreover, Hospital pays some independent contractor physicians to provide services in operating and emergency rooms; the trial court found that the income used to pay these physicians "was not derived from the recipients of [H]ospital's services." *Id.* at 41-42. The trial court concluded that allowing physicians from for-profit practices to have staff privileges at Hospital's facility violates the CCAL.

We question the trial court's reasoning on this issue. Section 8812(b)(1) of the CCAL, cited by the trial court, renders taxable "all property from which any income or revenue is derived, other than from the recipients of the bounty of the institution or charity." 53 Pa.C.S § 8812(b)(1). The trial court interpreted this provision to mean that "[H]ospital cannot use property it owns to derive[] income from sources other than patients." Trial Ct. Op. at 41. However, it is unclear how the trial court thought Hospital received such income. Where third-party physicians who are members of for-profit medical practices serve patients at Hospital's facility pursuant to their staff privileges, the patients pay the doctors, not Hospital, for those

29

services. *Id.* In addition, those patients are also Hospital patients paying separately for Hospital's services, so any patient payments made to the third-party doctors are still being paid by the recipients of Hospital's bounty. To the extent that Hospital purchases some physician services from a medical group owned by Tower Health, the trial court did not explain how that constitutes income or revenue to Hospital.

For these reasons, we believe the trial court erred in finding that Hospital derived income other than from the recipients of its bounty. However, because we have determined that the trial court correctly found Hospital failed to meet the requirements of the *HUP* test and Act 55, any error in the trial court's analysis under the CCAL was harmless.

## D. Improper Consideration of Expert Testimony

Hospital argues that the trial court erred in considering the testimony of the taxing bodies' expert witness, Bruce Loch (Loch), because his testimony improperly offered legal conclusions and those conclusions were contrary to existing law. Hospital's Br. at 29-37. According to Hospital, Loch improperly asserted that (1) Medicare reimbursement shortfalls and bad debt write-offs did not constitute gratuitous services, (2) 70% of the bonus incentives for Hospital's executives was based on Hospital's financial performance, (3) Cepielik relied on calculations regarding gratuitous services that were not in accordance with GAAP, and (4) granting hospital privileges to non-employee physicians violated CCAL requirements for tax exempt status.[20] *Id.* Because the trial court's opinion, which decided the tax exemption applications of all three LLCs, was consistent with Loch's assertions, Hospital infers that the trial court must have relied improperly on Loch's

---

[20] Issues (1) and (4) are discussed in previous sections of this opinion.

30

testimony in deciding this case. *See id.* We believe this inference is largely unsupported by the record, and further, any error the trial court may have made was insufficient to require reversal of its decision.

Regarding the connection between executive bonuses and financial performance, Hospital correctly observes that the trial court relied on Loch's testimony that 70% of Hospital's executive bonus incentives were tied to financial performance goals. *See* Trial Ct. Op. at 35 (citing Loch's testimony as the source of the 70% figure). As Hospital explains, Loch reasoned that

> taking into account both the 40% [financial] performance goal based upon the operating margin of [Hospital], and the "[c]ircuit [b]reaker"[21] goal based upon the operating margin of Tower [Health], which reduces the entire bonus by 50% if not achieved, an executive would be eligible to earn only 30% of an annual maximum bonus if [Hospital] and Tower [Health] do not achieve their operating margin goals (60% of bonus based upon [] Hospital's non-financial goals multiplied by 50% if the [c]ircuit [b]reaker is not achieved = 30% eligibility).
>
> Thus, 70% of [] Hospital executive bonus amount is based upon [] Hospital and Tower [Health] both meeting threshold financial goals for operating margin.

Hospital's Br. at 32 (quoting RR at 871a).

Hospital insists that Loch's calculation in this regard was "tortured logic." Hospital's Br. at 33. In Hospital's view,

> the circuit breaker served not as a "financial goal" that would increase incentive bonus compensation; rather, it

---

[21] As Hospital explains, "Tower [Health]'s incentive compensation plan included a 'circuit breaker' designed as a 'safety valve' to ensure that, if the system fell below a certain level of financial performance, the award of incentive compensation would be prudent and would not cause financial harm to an already financially stressed organization." Hospital's Br. at 14 (citing RR at 433a-34a).

31

> functioned as a fail-safe to allow Hospital to reduce or withhold altogether incentive compensation in bad years. Thus, meeting the circuit breaker threshold did not result in any additional compensation, but failing to meet the threshold might, at the discretion of the Executive Compensation Committee, result in the reduction or elimination of incentive compensation.

*Id.*

Thus, Hospital draws a distinction between bonus incentives, which allowed executives to receive bonuses for achieving financial goals, and the circuit breaker, which allowed Tower Health to reduce or eliminate bonuses where threshold financial goals were not achieved. Further, Hospital argues that it did not rely substantially on financial performance in awarding executive bonuses because application of the "circuit breaker" actually resulted in *no* executive bonuses during most of the tax years at issue because of the COVID-19 pandemic. Hospital's Br. at 61-62 & n.43. The trial court rejected these arguments, explaining:

> The bonus compensation plan remained in place, whether paid or not. The fact that the executive compensation plan was suspended only further serves to emphasize that [H]ospital did not operate entirely free from private profit motive. Contrary to [H]ospital['s] arguments, the "circuit breaker" demonstrates that a bad year resulted in financial consequences to the executives. Whereas a good year or a "profitable" year resulted in large payouts to selected people.

Trial Ct. Op. at 37.[22] We discern no error in the trial court's reasoning. While 40% of the bonus incentive was directly tied to financial goals, Tower Health also retained

---

[22] In addition, we note that one of Hospital's compensation experts specifically advocated for executive incentives based on financial performance, asserting that successful financial performance is "critical to an institution being able to meet [its] mission and essentially to be able to fund [its] ability to be an ongoing institution and resource to the community." RR at 738a. This may be a sound business strategy, but it is directly contrary to the requirements of the *HUP* test

the power to reduce or eliminate the remaining portion of the bonus incentive where threshold financial goals were not met, thus effectively tying *all* bonus incentives to financial performance, not just the 70% posited by Loch.

Moreover, as stated above, Hospital itself acknowledges that 40% of the bonus incentives, their largest single component, was based on achieving financial performance goals. RR at 371a, 373a, 739a & 746a. Although Hospital contends that Loch's 70% figure was improperly derived, it does not specifically assert that basing 40% rather than 70% of the bonus incentives on financial performance goals would render those bonus incentives compliant with the *HUP* test or Act 55. Instead, Hospital suggests that the proper calculation is the percentage of an executive's *overall* compensation package that is tied to financial performance and argues *that* percentage is not substantial. *See* Hospital's Br. at 15-17 & 60-61. The trial court obviously rejected Hospital's argument, and we cannot say that rejection was error.

Next, regarding the flaws in Cepielik's testimony based on non-GAAP calculations, as discussed above, there was competent record evidence to support the trial court's conclusion on the GAAP issue without reliance on Loch's testimony. Indeed, the trial court did not mention Loch's testimony in its GAAP discussion; rather, the trial court's discussion of the GAAP issue related solely to information elicited from Cepielik on cross-examination. *See* Trial Ct. Op. at 30 & 40.

Hospital also contends that the trial court erred in refusing to allow rebuttal testimony by Cepielik in response to Loch's testimony that Cepielik's expert opinion was unreliable because he improperly relied on non-GAAP numbers in

___

and Act 55 that executive compensation must *not* be tied to the entity's financial performance if the entity is to qualify for a tax exemption as a non-profit organization.

formulating that opinion. Our review of the trial transcript indicates that despite an objection by opposing counsel, Cepielik was allowed on redirect examination at trial to explain at length the relationship between his opinion and GAAP, as follows:

> [HOSPITAL COUNSEL]: When you did audits of hospitals and health care records did all the documents you reviewed in conducting your audits were they always prepared in accordance with GA[A]P?
>
> [CEPIELIK:] No.
>
> [DISTRICT COUNSEL:] Objection, relevance. Not relevant as [sic] him as an auditor.
>
> THE COURT: It should be clear. I know we're tired. Isn't it clear that I think the witness'[s] testimony and I'm not giving you any idea of the weight or value but as I understand the testimony, you reviewed documents. Those documents in and of themselves were not prepared in accordance with GA[A]P but his phrase would have been used to input numbers into documents that may or may not have been prepared in accordance with GA[A]P. Isn't that basically what his testimony is?
>
> [CEPIELIK]: May I?
>
> THE COURT: No. I think that is where we are now. We're into what you would do with an audit which is irrelevant which [sic] it qualifies under the HUP test, Act 55.
>
> [CEPEILIK]: GA[A]P numbers are GA[A]P numbers. There are certain numbers that are not GA[A]P numbers. I would say as an accountant this calculation is based upon GA[A]P and I'm happy to explain that further.
>
> [HOSPITAL COUNSEL]:
>
> Q  Can you explain further?
>
> A  Sure. When you're calculating revenue, again, remember, the whole start of this calculation is revenue. Revenue based upon my calculation of gross

34

charges. The recording gross charges in their ledger when those gross charges are earned. So that is based upon a day in the patient service.

Then you have to take that information from gross charges and you have to put it down to the net realizable value and come up with a GA[A]P revenue number. When you come up with a GA[A]P revenue number from gross charges you do what is called portfolio approach.

That portfolio approach looks at what are the collections, what are the statistics, what are the ultimate net realizable value of that number. You sometime[s] do it on a patient-by-patient basis. You sometimes do it on a portfolio basis. That is what the accounting standard calls for.

So to get to a portfolio basis and reduce gross charges, the net realizable value, you look at things like what are collections over time. If you're trying to estimate what a cost is you estimate cost on a cost-to-charge basis.

When I say that my calculation was based upon GA[A]P numbers, it was. I use[d] GA[A]P numbers from the ledger. I use[d] GA[A]P numbers from the financial statements. And then where I needed to make estimate to get down to what an estimated cost was, I used those inputs that you would have used to run the books and records of [H]ospital.

Q    Were your estimates performed in accordance with GA[A]P principles?

A    Yes.

Q    Is it necessary to have actual GA[A]P documents in order to reach the conclusions you reached?

A    Well again, the numbers that I used in my calculations that were GA[A]P numbers, yes. Statistics, by their very definition are not - - you can never have a statistic that has a GA[A]P number but it's an input into a GA[A]P number.

35

> Q      Is that something that you routinely do as an accountant?
>
> A      Yes.
>
> Q      Does that make your number any less reliable?
>
> A      No.
>
> Q      Is GA[A]P a process or is it a document?
>
> A      GA[A]P principle, it's both a concept and it's a set of rules.

RR at 386a-89a. At the end of trial, Hospital attempted to recall Cepielik for rebuttal. The colloquy on this issue was, in pertinent part, as follows:

> [HOSPITAL COUNSEL]:  [W]e never got any reasoning from Mr. Loch in his report as to why these documents were not – that Mr. Cepielik relied on – were not appropriate, and so we didn't hear it for the first time until he testified, so we'd like the opportunity to just make two basic points regarding that testimony.
>
> THE COURT:  Quite honestly, I think the points have been made.  Mr. Loch testified that he thought the documents should not be relied upon because they were not GAAP, using air quotes, qualified or GAAP prepared documents.
>
> When your witness testified yesterday, I remember specifically there was an objection, and I answered it, so I remember what I said, and I have my notes.  I looked at them at lunchtime.  I said something to the effect that your expert testified that he relied upon information that was the data that would go into a GAAP prepared report.  And it was all the same data.  So, no, no further witnesses.

RR at 725a-26a.

Before the trial court, Hospital did not explain what information, in addition to the detailed testimony already presented to and acknowledged by the trial

36

court, it wished to offer on rebuttal; nor does it do so in its brief before this Court. We discern no error in the trial court's refusal to allow, as rebuttal, evidence that apparently had been previously presented.

For these reasons, we conclude that, in the context of the trial court's overall reasoning, its allowance of Loch's testimony and its disallowance of rebuttal evidence were, at most, harmless error.

## E. Applications to Strike Brief of *Amici*

Hospital filed an application for relief asking this Court to strike the brief of *amici* Patientrightsadvocate.org and Families USA on the basis that the brief relied on matters that were outside the record or raised issues that were not preserved. This Court does not consider evidence outside the record. *See Tennyson v. Zoning Hearing Bd. of W. Bradford Twp.*, 952 A.2d 739 (Pa. Cmwlth. 2008) (stating that assertions outside of the record may not be considered on appeal). Further, we do not consider any legal arguments not preserved by the parties and *amici* may not assert such arguments. *See Stilp v. Commonwealth*, 905 A.2d 918, 928 n.14 (Pa. 2006) (noting that *amici* must take the issues as raised by the parties and cannot inject new issues that the parties have not preserved). Therefore, we have not considered any extra-record information contained in the brief filed by the *amici*. Accordingly, we dismiss Hospital's application for relief as moot.

The District filed a conditional cross-application asking this Court to strike the *amicus* brief of Hospital and Healthsystem Association of Pennsylvania in the event that we strike the brief of Patientrightsadvocate.org and Families USA. We likewise dismiss the District's application as moot.

## IV. Conclusion

Based on the foregoing analysis, we grant the Board's application for relief and dismiss Hospital's appeal because Hospital's noncompliance with Rule 1925(b)(4) resulted in waiver of all issues on appeal. We dismiss as moot Hospital's application to strike the brief of *amici* Patientrightsadvocate.org and Families USA. We likewise dismiss as moot the District's conditional cross-application to strike the *amicus* brief of Hospital and Healthsystem Association of Pennsylvania.

_____
CHRISTINE FIZZANO CANNON, Judge

Judge Wallace did not participate in the decision in this case.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Phoenixville Hospital, LLC, | : | CASES CONSOLIDATED |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| County of Chester Board of | : | |
| Assessment Appeals, Phoenixville | : | |
| Area School District and | : | No. 1281 C.D. 2021 |
| Borough of Phoenixville | : | |
| | : | |
| | : | |
| | : | |
| Phoenixville Hospital, LLC, | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| County of Chester Board of | : | |
| Assessment Appeals and | : | No. 1285 C.D. 2021 |
| Phoenixville Area School District | : | |

## O R D E R

AND NOW, this 10th day of February, 2023, the application for relief of the County of Chester Board of Assessment Appeals is GRANTED and the appeal of Phoenixville Hospital, LLC (Hospital) is DISMISSED.  Hospital's application to strike the brief filed by Patientrightsadvocate.org and Families USA as *amici curiae* is DISMISSED AS MOOT.  The conditional cross-application of Phoenixville Area

School District to strike the brief filed by the Hospital and Healthsystem Association of Pennsylvania as *amicus curiae* is DISMISSED AS MOOT.

_____
CHRISTINE FIZZANO CANNON, Judge